56 CCPA
### STAALKAT OF AMERICA, INC.,
Appellant,

v.

### The UNITED STATES, Appellee.
Customs Appeal No. 5301.

United States Court of Customs and Patent Appeals.

May 15, 1969.

Stein & Shostak, Los Angeles, Cal., attorneys of record, for appellant. S. Richard Shostak, Los Angeles, Cal., of counsel.

Edwin L. Weisl, Jr., Asst. Atty. Gen., Alan S. Rosenthal and Patricia S. Baptiste, Washington, D. C., for the United States.

Before RICH, Acting Chief Judge, NEESE, Judge, sitting by designation, and ALMOND and BALDWIN, Judges.

ALMOND, Judge.

Staalkat of America, Inc., appeals from a judgment of the United States Customs Court, Second Division,[1] overruling its protest against the collector's assessment of duty at 12½ per cent ad valorem on a Staalkat egg-handling machine imported in May 1953. The assessment was based upon the classification of the machine as an article having as an essential feature an electrical element or device under paragraph 353 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 55615 and T.D. 55649.

Appellant's principal claim is that the machine, which has for its primary function the sorting or sizing of eggs by weight, is entitled to free entry as an agricultural implement under paragraph 1604 of said Act. Alternatively, appellant claims that the imported merchandise does not have as an essential feature an electrical element or device, and that it is properly dutiable at 11½ per cent ad valorem under the provision for "ma-chines, not specially provided for," in paragraph 372, as modified by the General Agreement on Tariffs and Trade, T.D. 54108.

The issues presented are:

1. Whether the Customs Court correctly held that the machine in question, used both by farmers and processors to grade, size and mark eggs preliminary to marketing, is not an agricultural implement within the meaning of said paragraph 1604.

2. Whether the Customs Court correctly held that the Staalkat egg-handling machine's candling function, which utilizes electric power, is an essential element of the machine's operation, with the result that the machine is properly classified as an article having as an essential feature an electrical element (paragraph 353) rather than as a machine not specially provided for (paragraph 372).

The statutes involved are, in pertinent part, as follows:

Paragraph 353 of the Tariff Act of 1930, 19 U.S.C. § 1001:

Articles having as an essential feature an electrical element or device * * * not specially provided for:

\* \* \* \* \* \* \* \*

Other * * * ............................12½% ad val.

Paragraph 1604 of the Tariff Act of 1930 (Free List), 19 U.S.C. § 1202:

Agricultural implements: Plows, tooth or disk harrows, headers, harvesters, reapers, agricultural drills and planters, mowers, horserakes, cultivators, thrashing machines, cotton gins, machinery for use in the manufacture of sugar, wagons and cars * * and all other agricultural implements of any kind or description, not specially provided for, whether in whole or in parts * * *: *Provided,* That no article specified by name in Title I shall be free of duty under this paragraph.

Paragraph 372 of the Tariff Act of 1930, 19 U.S.C. § 1001:

Machines, finished or unfinished, not specially provided for:

\* \* \* \* \* \* \* \*

Other * * * ............................11½% ad val.

1. 59 Cust.Ct. 241, 273 F.Supp. 417, C.D. 3130.

At the trial below the court granted plaintiff's motion to have the record in Staalkat of America, Inc. v. United States, C.D. 2526, incorporated with the instant case.

In resolving the issues presented, we deem it necessary to set out to some extent the evidence adduced by appellant below to discharge the burden incumbent upon it to sustain its protest against the collector's assessment of duty.

The function of the Staalkat machine was described by Dr. Cliff Carpenter, a consultant to appellant:

> Generally the machine * * * has three functions: It separates the eggs by sorting, by a weighing device, into various weights, for example, a standard dozen eggs, which we call a standard dozen eggs, weighs 24 ounces. * * *
>
> The second thing it does, it provides for viewing by what we call flash candling, the interior quality of the egg, and this is the word "grading."
>
> And then it provides also as the eggs are rolled off the weighing scales onto the gathering tables or down the lanes, it provides for a marketing [sic] service or mechanism for any reason if you wish to identify the egg by a specific symbol.

In performing the functions described by Dr. Carpenter, the machine employs three basic sections. The eggs are placed in the infeed section; then they are moved along through a closed area with a screen and space for electric lights where grading or candling is accomplished. The candling process involves placing each egg against a strong light in order to determine whether blood clots are present therein; whether the egg is fresh or old by observing the size of the air space within the shell and to reveal the presence of any hidden cracks. It appears that candling separates out the undergrade eggs and determines the grade of the acceptable eggs. The above steps having been taken, a conveyor takes over and carries the eggs from the candling area to a series of scales which weigh each egg, thus determining classification as to size. The egg is then ejected from the scale where an automatic arm may mark the egg if desired. From the marking point the egg rolls to a location from which it is hand-packed into cartons. The record reveals that the value of the machine's utility resides in its high degree of accuracy and the fact that it handles eggs gently, thus minimizing breakage.

Dr. Carpenter testified that there are four categories of buyers and users of the Staalkat machines. These are: (1) individual producers consisting of farmers who own a large enough number of layers to justify investing in such a machine, which is a rather costly item; (2) farmer-cooperatives which consist of a group of farmers producing eggs on an individual basis but marketing through a cooperative group; (3) farmer-processors who distribute and market the eggs and own a large number of layers and thus qualify as producers; and (4) processors who own no poultry and are thus not producers but who market eggs by processing and distributing them.

The testimony in the incorporated case reveals that at that time there were 150 Staalkat machines in this country and that 20 per cent of that number were owned by independent processors who handle about 15 per cent of all eggs produced nationally. About half of the remaining number were owned by farmer-processors and the remainder were owned by farmers or farmer-cooperatives.

As to the general uses of the Staalkat machine, Dr. Carpenter testified that among farmers and farmer-processors ownership of the machine resided in the individual, while among farmer-cooperatives the machine is owned by the cooperative. The producer not owning or having access to a machine may sell his eggs to an independent processor. The witness estimated that of the 75 to 80 per cent of eggs sold to independent processors the method of payment is based on grade and size. Where the producer is not satisfied with the size and

grade determination, he can have his eggs returned or the processor can decide, after grading, that he does not desire to consummate a purchase. It is the general practice of the small producer to sell his eggs on a case-count basis irrespective of grade. It appears that as a producer becomes larger, owning over 3,000 layers, it is likely that he will market his eggs through a cooperative or by selling to a farmer-processor. If a producer owns between 50,000 and 100,000 layers, he is in a position to purchase his own egg-handling machine. Approximately 12 per cent of egg production nationwide is by producers owning more than 100,000 layers.

With reference to the operation situs of the egg-handling machine, the witness testified that it was desirable to do the sorting on the farm in order to eliminate unnecessary handling which adversely affected the quality of the eggs. In the case of the farmer-processor and the farmer-cooperative, the machine may be found in a centralized plant off the farm, or may be located on the farm. The witness estimated that of the machines owned by farmers, farmer-processors and farmer-cooperatives, 50 per cent were located on farms and 50 per cent were not. All of the machines owned by independent processors were located off of the farm.

Dr. Carpenter stated that the machine, in its imported condition, has outlets for electrical connections, but the motor power for the conveyor belt could also be furnished by a gasoline engine. When asked on cross-examination how many machines he had seen operated without the use of electricity, he answered "I haven't seen any." He stated that some purchasers of the machine did not use the candling operation and that the egg-marking device was used on about three to five per cent of all eggs processed by the machine. The witness further testified that the machine in nowise served to increase the productivity or the quality of eggs but that it helped "very materially in the marketing of the eggs," and helped the farmer because it was economical and

reflected the true grade and value of his product.

Appellant's witness, Rushton Backer, a Staalkat distributor for the western half of the United States, expressed the opinion that the machine was essential to the process of marketing eggs. He stated that, as imported, the machine has no motor power and is usually operated by a ½ horsepower domestic electric motor but no changes would be necessary to power the machine with nonelectric motors. He observed, however, that since the candling feature requires electric lights, a nonelectric motor would have a generator to provide the required electricity and that while the machine can be used without the candling function, it was "highly unlikely" that one would buy a Staalkat machine and use it only for weighing and sizing eggs.

The record discloses that Olson Brothers, the largest independent processor and distributor of eggs in the world, operates 25 plants in which eggs are processed for distribution. It owns half or controlling interest in ten ranches where eggs are produced and operates about a dozen packing and processing plants where its equipment is located on ranches which it does not own. It owns 27 Staalkat machines.

Olson's general manager, Jon Huntsman, testified that formerly eggs were taken directly from the farm to urban area processing plants where they were sized, graded and packed for distribution but that, currently, 80 per cent of Olson's urban plants are engaged solely in the distribution of eggs which are processed and packaged on the ranches. He pointed out that while eggs which have not been processed cannot be sold to the ultimate consumer, they may be sold to other egg dealers and processors and that Olson buys a considerable amount of eggs which have not been processed and which are paid for on a grade-back basis. The witness stated further that 93 to 95 per cent of the eggs processed and distributed by Olson are produced by independent ranchers and sold, without processing, to Olson; that in all cases the Staalkat

candling feature was used and that it was operated by electricity; that the machine did not improve the quality of the eggs but merely determined existing quality and that it bore no relation to the production of eggs by the hens.

Lawrence Thompson, also associated with Olson, testified that candling eggs was necessary to meet the standard established by state law; that Olson always used the candling feature; that the Staalkat candling device enabled Olson to increase the speed of candling and that he did not know of any method of using the candling feature other than with an electric light.

The witness Louis P. Corbetta owns and operates four farms in California devoted to egg production. He purchased three Staalkat machines and, as have other large producers in his area, set up his own processing plant. He stated that his present method of operation is more profitable because he can now sell on the basis of an established grade and effect his processing by lower priced agricultural labor. While Corbetta has substituted another electric candling device to replace that feature in the Staalkat machine, he agreed that when an operator owned a Staalkat and used its candling feature, such candling feature was essential.

The witness Edmond N. Demler owns two farms. He owns two Staalkat machines. The witness stated that the Staalkat does not increase the quality of individual eggs yet it makes it more desirable and economical to have a large operation and on-farm processing, which is more efficient and enables the producer to reduce labor cost. When asked on direct examination what he considered to be marketing of eggs, the witness replied:

I believe after the eggs leave the nest and are delivered into the processing plant and I think the marketing takes place from the standpoint of time that we start moving it through our equipment and processing so that it meets the state and federal laws.

The witness further stated that the eggs "are not in a marketable condition before they go through the Staalkat machine."

In the course of an exhaustive opinion reviewing the evidence and outlining what it considered the applicable legal principles, the Customs Court found that the machine in issue was not used in the production of food, nor necessary to the sale of eggs by the farmer; that it did not improve the quality of the eggs; nor was it shown to be chiefly used on farms or by farmers nor that its function in preparing crops for market was an incident to farming, and therefore did not qualify for duty free entry as an agricultural implement under paragraph 1604.

As this court observed in Sortex Co. of North America, Inc. v. United States, 410 F.2d 443, 56 CCPA ——, C.A.D. 951, involving a determination whether electronic color-sorting machines classified as articles having as an essential feature an electrical element or devise under paragraph 353 of the Tariff Act of 1930 should, as contended by appellant therein, have been classified as agricultural implements entitled to entry free of duty under paragraph 1604, we do not deem it necessary here to discuss in extenso the array of decided cases analyzed and construed in the opinion of the court below. The relevant tariff provisions are clear and concise and here, as in the apposite decided cases, the decision in each case, as it arises, must turn on the relevant facts and circumstances appertaining thereto. As a general norm of guidance derived from the decided cases, we consider essentially sound the observation made by the Customs Court herein:

* * * it appears that the provisions for free entry for agricultural implements, not provided for specially in tariff acts, include on-farm equipment for handling, packing, preparing for market, crops produced on the farm, but does not include equipment used commercially for packing or marketing for others or for the manufacture of food products. Such preparation for marketing must be as an

incident to production by the farmer and not primarily as an incident to marketing as a separate enterprise.

We think it clear from the record that the involved machine serves no function in the production of eggs; it has nothing to do with the quality of the eggs which are complete physical embodiments as to shape, size, weight and content before the machine begins its function; it is not merely to put eggs into convenient form for transportation to market. It is designed to sort eggs according to size and to candle or grade eggs. According to Dr. Carpenter, it is of material service to the marketing process. The record reflects that sorting and candling are not strictly necessary to the sale of eggs by the farmer. In large measure eggs are sold to commercial processors and distributors who candle and grade, as an enterprise separate from production, before sale to the ultimate consumer. While their sales are diminishing, eggs, in appreciable quantity, are still bought, unwashed and ungraded, by the consumer directly from the farmer.

According to the witness Corbetta, the marketing of eggs is "a very complicated, artful operation * * * performed by distributors and dealers who buy * * * from farmers and sell" to stores as outlets to ultimate consumers.

The Customs Court, in assessing the testimony adduced by appellant relating to the ownership and use of the machines by cooperatives and farmer-processors, found it insufficient to establish that they were chiefly used by farmers. Dr. Carpenter's testimony, limited to cooperatives located in California, stated, however, that the cooperatives did own the machines, the farmers' interest being indirect by virtue of his relationship with cooperatives.

We do not consider it of material import whether the machines were owned by a cooperative, the independent processor or the farmer-processor, nor is the situs of operation, whether on or off the farm, the determinative factor. They

were all operated in a substantially similar manner for a similar purpose. The record discloses that where the farmer-processor produced and processed eggs derived from its own ranches, it was still engaged in the business of buying eggs from farmers and then processing and distributing them. The large Olson enterprise produces on its farms only five to seven per cent of all the eggs it processes and markets with the remainder purchased from independent producers.

It is our view that the processing of eggs as reflected by this record is clearly preparatory to marketing as a business enterprise related to, but in essence separate and distinct from, the theretofore completed process or pursuit of egg production.

We concur in the rationale succinctly applied by the Customs Court in the incorporated case that:

* * * the true test for the determination of whether a machine such as is involved herein, the sole functions of which are the sorting, grading, and marking, of eggs, is an agricultural implement is not who owns it or where it is used, but, what is its chief use? In other words, is it chiefly used for agricultural purposes? Irrespective of who owns the instant machine or where it is located, it seems obvious that it performs the functions of a marketing device, and is not one devoted to the agricultural production of food, to wit, eggs. Therefore, the machine is clearly excluded from the provision for "agricultural implements." Every article used by a farmer is not necessarily an agricultural implement within the intendment of paragraph 1604, *supra*. [Citation omitted.]

We hold therefore, as did the court below, that the Staalkat machine in issue is not an agricultural implement within the meaning of paragraph 1604.

Remaining for resolution is the issue whether the candling feature of the

Staalkat machine renders the machine an article having as an essential feature an electrical element or device, as classified, within the purview of paragraph 353. The court below found as a fact, supported we think by substantial evidence, that the machine, in its imported condition, did have a candling feature as an electrical element. While it is true that some of the operators did not make use of the candling feature and that some of the machines in this country did not possess that feature, it does appear from the evidence that most of those who own such machines made use of this feature. The large Olson operation, owning 27 of the machines extant in this country, evidently considered the candling feature as an essential element as it consistently used it conjointly with the other features in processing eggs for market. The record amply supports the conclusion that the use of electricity through the medium of electric lights was indispensible to the accomplishment of the candling process. The witness Corbetta testified that while the machines in his operations did not contain the candling feature, "if the Staalkat incorporates a candling unit which is used by the operator of the machine it is essential." It appears from the record that the machine is so designed to have, and that it does have, at least two essential functions necessary to attain its intended purpose. These functions are sorting and grading or candling. The marking device appears to be a minor feature not in general use nor is it essential to the fulfillment of the machine's primary purpose. The testimony supports the conclusion, as stated by one of the witnesses, that it is highly unlikely that a person would buy a Staalkat machine with a candling feature and use it for sorting only.

In our opinion, the record before us supports the finding of the Customs Court that the candling feature is an essential and primary part of the imported machine so as to make it an article having as an essential feature an electrical element or device properly dutiable within the purview of paragraph 353.

We therefore affirm the judgment of the Customs Court.

Affirmed.