**E. DILLINGHAM, INC., Appellant,**

**v.**

**The UNITED STATES, Appellee.**

**Customs Appeal No. 5538.**

United States Court of Customs and Patent Appeals.

Feb. 7, 1974.

---

10. *See* Brady, *supra*, note 6, at 267, n. 28.

Staten Island, N. Y., for the United States.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

Eugene F. Blauvelt, New York City (Sharretts, Paley, Carter & Blauvelt, New York City), attorneys of record, for appellant. Gail T. Cumins, New York City, of counsel.

Irving Jaffe, Acting Asst. Atty. Gen., Andrew P. Vance, Chief, Customs Section, New York City, David A. Ast,

MILLER, Judge.

This appeal is from the judgment of the United States Customs Court, 70 Cust.Ct. 141, C.D. 4420, 358 F.Supp. 1295 (1973), dismissing appellant's claim for refund of duty and affirming the classification by the Customs Service under item 100.53 TSUS of nine imported female Holstein-Friesian bovines, each weighing 700 pounds or more and pregnant for the first time. We affirm.

The pertinent statutory provisions are as follows:

Tariff Schedules of the United States

Schedule 1.

Part 1.—*Live Animals*

Part 1 headnotes:

    \*   \*   \*   \*   \*   \*   \*   \*

2. Unless the context requires otherwise, each provision for named or described animals applies to such animals regardless of their size or age, e. g., "sheep" includes lambs.

    \*   \*   \*   \*   \*   \*   \*   \*

Live animals other than birds:

    \*   \*   \*   \*   \*   \*   \*   \*

Cattle:

    \*   \*   \*   \*   \*   \*   \*   \*

Weighing 700 pounds or more each:

100.50   Cows imported specially for dairy purposes ...... 1¢ per lb.

Other:

100.53   For not over 400,000 head entered in the 12-month period beginning April 1 in any year, of which not over 120,000 shall be entered in any quarter beginning April 1, July 1, October 1, or January 1 .............................. 1.5¢ per lb.

Appellant argues that each of the animals in question was a "young cow" imported specially for dairy purposes; that a young cow carrying a calf is just as "suitable" for dairy purposes as one which has just given birth to a calf; and that paragraph 2 of the headnotes makes clear the Congressional intent that any cow, imported specially for dairy purposes, is to be classified under

item 100.50 if it weighs 700 pounds or more regardless of its age or size.

Appellee agrees with the opinion of the trial court that a heifer does not attain the status of a "cow" until parturition takes place for the first time. It contends that the trial court properly found that appellant's animals were not "cows"; also that, even if they should be determined to be "cows," they were incapable of being milked for commercial purposes at the time of importation and could not be classified as "cows imported specially for dairy purposes" under item 100.50 TSUS.

■ The basic issue is whether appellant has sustained its burden of proving that the animals in question were "Cows imported specially for dairy purposes" within the meaning of item 100.50. As the trial court correctly observed, the language involved in the TSUS appears for the first time in any tariff act of the United States. No definition is provided for "Cows imported specially for dairy purposes", so the trial court determined the common meaning of "cow." While we do not disagree with such determination, we believe the qualifying language "imported specially for dairy purposes" requires a determination of the meaning of "cow" in the dairying trade.

Both parties have cited various dictionary and lexicographic definitions, which support appellant's contention that a heifer is a young cow and appellee's contention that a cow is a female bovine which has produced a calf. However, since we are seeking the meaning of "cow" in the dairying trade for purposes of the tariff schedules, we do not regard these sources as particularly helpful—with the exception of the cited *Dictionary of Agriculture and Allied Terminology*,[1] which contains this definition: "Cow—a *market* term for designating a female bovine which has produced a calf." (Emphasis supplied.) See United States v. The Spiegel Bros. Corp., 51 CCPA 69, C.A.D. 839 (1964).

Appellee points out that Corpus Juris Secundum, Black's Law Dictionary, and Words and Phrases which appellant cites derive their definitions from cases concerned with state laws relating to theft or exemption from levy which are not, in the absence of evidence to the contrary, relevant to the purposes of the TSUS.

Appellant cites the First Reciprocal Trade Agreement with Canada (T.D. 48033), which became effective January 1, 1936, and the Digest of Trade Data published by the U. S. Tariff Commission in 1936 as the source of the provision for "Cows imported specially for dairy purposes", and contends that "cow" was used in lieu of, and in the same sense as, female cattle. This contention is based on a Customs Regulation (T.D. 48057), issued by the Secretary of the Treasury following the Canadian Trade Agreement, which directs that the Customs officer "shall satisfy himself that the animal is suitable for dairy purposes." Appellant further claims that "A young cow, heifer, which is carrying a calf, is clearly just as suitable for dairy purposes as a young cow, first-calf heifer, which has just given birth to a calf, and is beginning her first lactation."

■ We have concluded that these arguments must fail. The direction to the Customs officer in the quoted portion of the Customs Regulation could as well have been intended to prevent a reduction in duty from being applied to *cows* of a breed suitable for beef cattle production as to permit such reduction to be applied to all females of a dairy breed. Moreover, appellee has called attention to tables published by the Tariff Commission which appear in the above-referred to Digest of Trade Data. These tables list "Cows and heifers 2 years old and over," showing recognition of a distinction between "cows" and "heifers." Appellant has not shown that the Digest of Trade Data was considered

---

1. John N. Winburne, Michigan State University Press, East Lansing, Michigan (1962).

by the Congress. Assuming that it was, there is nothing in the legislative history of the TSUS to indicate other than tacit acceptance of this distinction. Finally, appellant appears to equate the phrase "suitable for dairy purposes" in the referenced Customs Regulation with "specially for dairy purposes" in the statute with which we are here concerned. The latter phrase denotes an exclusivity of purpose, which the animals in question did not possess because, at the time of importation, each had to first produce a calf before becoming marketable for dairy purposes. This is substantiated by the testimony of appellant's witness, Philip R. Goldberg, who stated that "ninety-nine per cent"—"a good many each day"—of the heifers imported by the partnership calved while in possession of the partnership after importation and prior to sale; that "most of the people that we sell cattle to in Connecticut are primarily in the business of producing milk. . . . they are interested in buying an animal that is ready to produce milk today." He also testified that pregnant heifers are valued the same as a cow in preparing financial statements for the partnership for commercial bank loan purposes. While no evidence was submitted that the lending agencies regarded such heifers as "cows," the testimony serves to show that the impending calf crop from such animals was a commercial consideration for such valuation purposes.

Six witnesses were presented by appellant: Robert Perry, a drover who bought bred heifers from Canadian dairy farmers for the importing firm; Norman and Philip Goldberg, members of the importing firm; Richard Lewis, Robert Thompson, and Irwin McQuer— all long-time dairy farmers. Perry testified that he regarded a heifer as a young cow and defined a cow as "an animal that produces a calf." Norman Goldberg testified that to him the word "cow" as applied to dairy cattle meant "an animal that is matured, five years of age, full mouth [eight teeth]"; that

an animal three or four months prior to giving birth to her first calf is "a young cow." Philip Goldberg, in addition to the testimony earlier referred to, testified that the animals in question were sold to two operators of dairy farms in Connecticut; that a heifer is the same as a young cow; that a mature cow has a "full mouth"—"eight teeth."

Witness Lewis testified that to him the term "heifer" meant "a young cow"; that, in his opinion, a cow "is a female bovine as the other people [appellant's previous witnesses] have said." Witness McQuer testified that his understanding of the word "cow" was "a female with a full mouth"; that a heifer is a "young cow." In answer to a question on cross-examination whether he would accept delivery of an open (unbred) heifer when he had ordered a cow, he responded: "Not if I wanted an animal for milk." Witness Thompson, on *direct examination,* testified that he grew up on a dairy farm, had operated his own dairy farm since 1944, was chairman of the board of the Eastern Artificial Insemination Cooperative, and traveled widely in the United States in that official capacity; that, in his understanding of a dairy cow, *"We never refer to an animal as a cow until after she has had a calf."* (Emphasis supplied.) He stated that "a senior yearling heifer is a heifer between the ages of 18 and 24 months" and that such an animal "could still be a cow if she has produced a calf and she could produce a calf as a senior yearling, but not ordinarily." On cross-examination, he further testified that he belonged to the New York Holstein Association and paid dues on the basis of a flat fee plus an additional amount for each milking cow in the herd or each cow which has milked; that *bred heifers in their last month of pregnancy would not be counted for dues purposes.*

Three witnesses were presented by appellee. The first was Dr. Edwin Smith, a practicing veterinarian since 1943 with degrees from New York State Ag-

ricultural College at Cornell University, and currently a professor of Animal Science at Canton (New York) Agriculture & Technical College. He testified that he was born and raised on a farm and had owned his own dairy farm; that a cow by definition is "an animal that has those anatomical and physiological changes brought about by having a calf"; that a heifer is "a female bovine animal that has not had a calf"; that he would not consider bred heifers to be cows because "they have not had their first calf and do not have the anatomical and physiological changes that come about by having that calf," and that he had attended five auctions a year during his years as a veterinarian where there were separate categories for "bred heifers" and "cows." He also stated that the factor of teeth is not determining between heifer and cow, although it is a factor in age.

Appellee's next witness was Dr. Frank Bancroft, also a Cornell University graduate, a veterinarian with the U. S. Department of Agriculture for over four years and previously in private practice for thirty-three years, born and raised in a dairy community. He testified that he believed a cow to be "A bovine animal that has had a calf and lactated" and that he would not consider a bred heifer to be a cow.

Appellee's third witness was James Repard, Executive Secretary of the New York State Holstein Association, which is a 4,600 member voluntary organization for the promotion and merchandising of Holstein cattle in the State of New York. He was born and raised on a dairy farm in the State of New York and, prior to becoming Executive Secretary, had owned and operated a dairy farm since 1938. He testified that he kept up with changes in the dairy industry by attending sales, meetings, and conventions and talking with farmers throughout the state. It was his statement that "A cow is a bovine female that has had her first calf," and that "A heifer is a heifer until she has her first calf and then becomes a cow." Based on

his experience as a dairy farmer and his position in the Holstein Association, he stated that it is normal among farmers to distinguish between cow and heifer, and that "No, no way" is a bred heifer known as a cow in the farming industry. He said "Definitely not" in response to a question of whether he would accept a bred heifer as delivery for a cow, and "No" to whether he would accept a cow when he had ordered a heifer. He pointed out that there are heifer classes in a show, followed by the cow classes. With respect to association dues, he testified that there is a $10 minimum fee plus 25¢ for every cow in the herd, not counting heifers even if bred. He described the classification program for members of the association under which a herd is enrolled, with each cow that has had a calf being listed and no animal being classified that has not calved. He identified appellee's Exhibit B, a catalog of a sale on May 6, 1972, as "very typical of the catalogues that we have at cattle sales," and interpreted the descriptions of various lots, thus: cow ("She has had at least one calf."); H. C. ("Heifer calf."); 1st ("She is milking with the first calf. She is a cow."); and B. H. ("Bred heifer.")

Appellant argues that the trial court applied a "narrow scientific meaning" of the word "cow" and that "The government witnesses, being men of science, interpreted the term 'cow' in the strict technical sense"; whereas "Appellant's witnesses, being men of the earth, defined cow in the language of everyday parlance." It is true that two of appellee's witnesses were veterinarians, but one had long been a dairy farmer and both practiced in dairy communities. Appellee's third witness could hardly be described as a "man of science"; not only had he been a long-time dairy farmer, but he also was an officer of wide experience in the New York Holstein Association which was concerned with the promotion and merchandising of animals of the same breed as the animals here in question. We also note that Robert Thompson, one of appel-

lant's "men of the earth" witnesses, testified on direct examination that "We never refer to an animal as a cow until after she has had a calf"; that another of such witnesses, Irwin McQuer, stated that he would not accept delivery of a heifer when he had ordered a cow "if I wanted an animal for milk." Such testimony supports appellee's response that its witnesses were not testifying solely from a scientific and technical frame of reference, but "in the language of commerce of those intimately familiar with bovine, dairy farmers, and all phases of dairy farming."[2] We conclude that the meaning of "cow" in the dairying trade is a female bovine of a breed suitable for dairy purposes which has produced a calf.

With respect to the applicability of paragraph 2 of the headnotes to item 100.50, we observe that "the context requires otherwise" only with respect to *size* of the cows being imported, because item 100.50 specifically requires that they weigh "700 pounds or more each." The context is silent on age, and from this appellant postulates that bred heifers as "young cows" would qualify. However, in view of our above conclusion on the meaning of "cow" and in further view of what we have said regarding the significance of the qualifying language "imported specially for dairy purposes" with reference to bred heifers, we conclude that paragraph 2 of the headnotes is of no avail to appellant.

In view of the foregoing, and having fully considered the evidence of record and the briefs of both parties, we hold that the animals in question were not "Cows imported specially for dairy purposes" for purposes of the TSUS.

The judgment of the Customs Court is affirmed.

Affirmed.

2. We observe a similar posture in the trial judge's reminiscence of having been accorded, as a young lad, the "dubious honor" of milking the family cows on a farm "in the beautiful and fertile Red River Valley of North Dakota."