## The DE LAVAL SEPARATOR COMPANY

### v.

### UNITED STATES.

**C.D. 4693; Court No. 72-6-01352.**

United States Customs Court.

April 15, 1977.

Rode & Qualey, New York City (John S. Rode and Michael S. O'Rourke, New York City, of counsel), for the plaintiff.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D.C. (Steven P. Florsheim, New York City, trial attorney), for the defendant.

FORD, Judge.

This action presents for determination the proper classification of certain merchandise described on the invoice as "FARM TANKS WITHOUT REFRIGERATION UNITS." They were classified by Customs under item 661.35 TSUS as "refrigerators and refrigerating equipment,

whether or not electric, and parts thereof" and consequently assessed with duty at 6 per centum ad valorem.

Plaintiff contends said merchandise is entitled to entry free of duty under item 666.00 TSUS which provides for "* * * on-farm equipment for the handling * * * of agricultural * * * products, and agricultural * * * implements not specially provided for, and parts of any of the foregoing."

The involved tanks in their condition as imported are made of stainless steel. They are oval or cylindrical in shape and have double wall construction with thermal insulation between the walls. In addition, said tanks have a manhole, agitator, graduated dipstick, vent, inlet and outlet connection, built-in thermometer, refrigeration and electrical control panels and a washing spray ball. This unit when connected to a refrigeration unit and a source of electricity is capable of storing and cooling milk in accordance with 3–A Sanitary Standards formulated by the International Association of Milk, Food and Environmental Sanitarians, the U.S. Public Health Service and the Dairy Industry Committee.

The pertinent statutory provisions involved herein provide as follows:

Tariff Schedules of the United States:

* * * * * * *

Schedule 6, part 4, headnote 2:

* * * * * * *

2. Unless the context requires otherwise, and subject to headnote 1 to subpart A of this part, a multi-purpose machine is classifiable according to its principal purpose * * *.

* * * * * * *

Subpart A.—Boilers, Non-Electric Motors and Engines, and Other General Purpose Machinery

Subpart A headnote:

1. A machine or appliance which is described in this subpart and also is described elsewhere in this part is classifiable in this subpart.

* * * * * * *

661.35 Refrigerators and refrigerating equipment, whether or not electric, and parts thereof . . . . . . . . . . . . . . 6% ad val. [as modified by T.D. 68–9]

* * * * * * *

Subpart C headnote:

1. The provisions of item 666.00 for "agricultural and horticultural implements not specially provided for" do not apply to any of the articles provided for in schedule 6, part 2, part 3 (subparts A through F, inclusive), part 5 (except item 688.40), or part 6, or to any of the articles specially provided for elsewhere in the tariff schedules * * *.

---

666.00 Machinery for soil preparation and cultivation, agricultural drills and planters, fertilizer spreaders, harvesting and threshing machinery, hay or grass mowers (except lawn mowers), farm wagons and carts, milking machines, on-farm equipment for the handling or drying of agricultural or horticultural products, and agricultural and horticultural implements not specially provided for, and parts of any of the foregoing . . . . . . . . . . Free

The record consists of the testimony of three witnesses called by plaintiff and two on behalf of defendant. Plaintiff introduced and there were received 25 exhibits and defendant presented one exhibit.

The first witness called on behalf of plaintiff was William F. Crook, a former employee of the importer. His last position with the firm was that of product manager which included total responsibility for marketing of the bulk milk container on a national basis. The witness indicated that the invoice designations described the merchandise involved. The designation with the letter "E", a numeral designation, and an initial such as "ROB" are indicative of the characteristics of the tank. The letter "E" indicates that the item was for export. The numerical designation indicates the nominal capacity of the tank, the letter "R" indicates remote installation of the condensing unit at the farm, the letter "O" the configuration of the tank, to wit, oval, and the letter "B" designates the tank being of a bulkhead nature in that a portion of the tank would project outward from the milk room.

The witness identified plaintiff's exhibit 1 as sales literature prepared for the plaintiff under his supervision which portrays the merchandise in question. Plaintiff's exhibits 2 through 17 contain various photographs of the bulk milk tanks, accessories and the Tecumseh condensing unit which is added after importation. The witness indi-

cated that if a farmer orders a bulk milk tank he would not receive the condensing unit which is considered a separate entity and is billed to the dealer as a separate item. It is not part of the tank.

Mr. Crook then testified that the metallic portion of the tank is 300-series stainless steel containing polyurethane foam in the areas between the two walls of the tank. The polyurethane is found in varying thicknesses around the tank to provide thermal insulation. The witness has visited various dairy farms throughout the United States and observed the use of bulk tanks manufactured by the exporter, as well as others. They have on many occasions been used with or in conjunction with other items of equipment such as those designated on plaintiff's exhibit 19 which is a representation of a milking parlor. Based upon his association with plaintiff, Mr. Crook testified that approximately 5,000 farm bulk milk tanks were imported by his firm. He has seen bulk tanks used on dairy farms in all major milk producing states, such as the New England States, New York, Pennsylvania, Wisconsin, Michigan, Ohio, Minnesota, California and Idaho. He has never seen bulk tanks utilized other than on dairy farms. The witness then testified that the tanks imported by the De Laval Separator Company range in size from 320 United States gallons to 2,500 United States gallons.

On cross-examination, Mr. Crook stated that when milk leaves the cow's udder it is "around 100 degrees" Fahrenheit, and it enters the bulk milk tank at about 90 degrees. When it is picked up by the tank truck it is in the "40-degree range." The bulk milk tank will not function and operate for the purpose for which it was intended without a condensing unit. The witness further stated that the thermal insulation helps maintain the milk in a cool state as long as possible. The condenser unit consists of a motor compressor assembly, a condenser, a receiver, and the necessary electrical wiring. The washer unit is required under the standards for bulk milk tanks. The agitator and agitator drive operates by a thermostat in conjunction with the condensing unit. The agitator moves the milk across the bottom of the tank and prevents freezing when the unit is operating. In addition, it assists in uniform cooling of the milk. In its condition as imported, the tank includes a thermometer which indicates the temperature of the milk in the tank.

The control box pictured in plaintiff's exhibit 5 contains an expansion valve which controls the refrigerant flow into the evaporator.

On redirect examination Mr. Crook testified that cooling is only one function of the bulk farm tank. The tanks must be constructed in accordance with the 3–A standards which outline the quality of construction, the materials, and certain hygienic factors. It is mandated that the tanks use stainless steel which is not ideal from a cooling standpoint but is necessary because of the sanitary conditions which require the material to be "impervious," readily cleanable to a sanitary condition, and to prohibit the introduction of any foreign substance into the milk. The gasket surrounding the manhole cover is to prevent the entrance of dust, airborne particles, and insects, none of which affect the cooling of the milk. The witness also testified that the spray ball used to wash the tank does not have any effect on the cooling of the tank. The agitator according to the witness, in addition to preventing the freezing of the milk while the compressor is in operation, also assists in maintaining a homogeneous mixture during the time it is in storage. The agitator functions both while the compressor is in operation and when it is not in operation.

On re-cross-examination Mr. Crook admitted that there are a number of refrigeration systems whose function is solely for storage, such as walk-in coolers and cabinet refrigerators in a supermarket.

On redirect examination Mr. Crook identified the 3–A standards which cover the bulk milk tanks on pages 172 through 178. The standards book was received in evidence as plaintiff's exhibit 20.

Plaintiff's second witness, Mr. Richard Guest, a licensed mechanical engineer in the State of Pennsylvania, has a bachelor of science and a master of science degree from North Dakota State University and is presently employed by Cornell University as an extension specialist in materials handling and farmstead mechanics. His present job requires continuous contact with dairy farmers of New York State. He has visited dairy farms in most all the major milk producing states. The function of his present job is to disseminate knowledge obtained from research to the farmers. He is familiar with the production of milk on dairy farms and with bulk tanks in particular. The primary purpose of the milking system is the production of quality milk and this involves three major phases. These phases are the harvesting, handling and storage of the crop. By the use of plaintiff's exhibit 19, the witness described these three phases. According to the witness, the milking part is the harvesting. The transfer of the milk through the lines to the bulk tank constitutes the handling and storage of the milk.

Mr. Guest then testified as to the factors involved in the design of a system involving milk production. The 3–A standards, according to Mr. Guest, are set up as the requirements for such tanks. The use of stainless steel and glass is for the purpose of "cleanability" and visual inspection of the milking systems. In addition, the tank should be relatively tight to prevent the ingress of foreign materials.

According to witness Guest, the farmer's milk is picked up daily or every other day by a bulk over-the-road tanker. The farmer is paid for his product based upon weight which is calculated by means of a chart individually calibrated to the farmer's farm bulk milk tank and on its butterfat content. There are several major problems a farmer faces in storing milk. One of the problems is the leveling of the tank and the ability to maintain its level so as to permit an accurate reading on the measuring stick. Other problems involve the ability to clean the tank and the necessity to agitate the milk to prevent stratification of temperature as well as to insure the uniformity of the product. The stratification, according to the witness, is the difference in temperature between the bottom and top of the milk in the storage tank while the uniformity relates to the necessity of keeping the milk in a homogeneous state. The latter is necessary to maintain a uniform butterfat mixture.

On cross-examination Mr. Guest testified that the farmer must be a "clean producer." To accomplish this, he must prevent the entrance of sediment as well as having a low bacteria count which is a reflection of the state of health of his cows, and in addition, must preserve the milk by cooling until it is picked up. Witness Guest further stated that a freeze-up could occur if the evaporator was working and the agitator was not. He further emphasized the use of the agitator as being necessary to maintain a uniform butterfat mixture since there is inherent difficulty in remedying a situation once the butterfat has been allowed to separate out. While admitting that the tank does perform a cooling function he was of the opinion that the merchandise before the court was not capable of performing as a cooling system since it did not contain a condensing unit.

On redirect examination the witness summarized the functions of his farm bulk milk tank which include storage, the ability to provide an accurate reading of volume, agitation and the ability to clean the tank. The accurate reading of volume is of utmost importance since the farmer is paid for his milk by weight and butterfat content. In the opinion of Mr. Guest the bulk tanks involved are used for storage and handling of the product.

The next witness called on behalf of plaintiff was Mr. Sam P. Soling, president of St. Onge, Ruff & Associates, Inc., a consulting engineering firm specializing in food industry refrigeration. Mr. Soling is a licensed engineer in five states and has a master of science degree as well as a bachelor of mechanical engineering. His previous employment consisted of being an in-

structor in mechanical engineering at Stevens Institute of Technology, an industrial engineer, as well as chief engineer of refrigeration for the York Corporation. He is a member of the American Society of Mechanical Engineers and a fellow of the American Society of Heating, Refrigerating and Air Conditioning Engineers. As a member of the latter he served as chairman of the guide and data book committee which prepares the Refrigeration Guide and Data Book. Mr. Soling is familiar with farm tanks, similar to the tanks involved herein. With the use of exhibit 21, a schematic drawing of a refrigeration cycle, which was prepared under his direction and supervision, he explained the operation of a refrigeration cycle. In explanation of the symbols contained on exhibit 21, Mr. Soling testified that the letter "L" on the diagram stands for liquid and has been coded in the color green. The letter "V" stands for vapor and is colored red.

According to the witness, a refrigeration cycle utilizes a refrigerant and a compressor to reduce the pressure at which point the refrigerant can boil in the evaporator. This permits the temperature to be lowered sufficiently so that the medium being cooled can cause a flow of heat from the evaporator into the refrigerant. In this manner the pressure of the refrigerant is raised to permit it to condense at a temperature higher than the condensing medium. The effect is a heat pump to remove heat from an evaporator and reject that heat into the atmosphere.

Utilizing exhibit 21, the witness described the operation of the refrigeration cycle starting at the compressor which is the heart of the cycle. The compressor pulls vapor away from the evaporator fast enough to produce a low pressure and a low temperature which causes heat to flow. It is then compressed flowing up, as indicated by the arrows, to the condenser. The condenser is a piece of heat transfer equipment where the vapors flow inside the tube and air is circulated over the outside of the tube in order to condense the refrigerant which enters as vapor and leaves as a liquid. As the liquid leaves the condenser it flows to a receiver which is a part of the system to store up refrigerant so that, when needed, it is available to be put into the evaporator. The liquid leaving the condenser goes to the receiver and then through a filter which is an element used to remove any tiny particles of dirt to avoid clogging the parts of the control elements. As it leaves the filter it goes to a solenoid valve which is electrically operated to open or close on demand to prevent or permit the flow of the refrigerant. Following the solenoid is a bull's-eye or sight glass which is a means of indicating whether you have sufficient flow of liquid in the liquid line. The liquid then proceeds through a thermal expansion valve which controls the flow of the liquid refrigerant to the evaporator. The cycle continues to the evaporator where heat transfer takes places. On a cold refrigeration cycle the liquid changes to a vapor and accordingly this item derives it name, evaporator. The flow then continues to the feeler bulb on the suction line. The function of this item is to preserve a fine balance between getting sufficient liquid into the evaporator but not an overabundance which would come back to the compressor.

After viewing various photographic exhibits of the imported merchandise, Mr. Soling stated that the receiver compressor and condenser were not present in said exhibits and that such items are necessary for any closed circuit refrigeration cycle.

The witness further indicated, based upon his experience, that he had never seen bulk farm tanks, such as the merchandise before the court, used in commercial food processing applications.

On cross-examination Mr. Soling stated that a closed refrigeration cycle could function without a filter, solenoid valve, bull's-eye, or thermal expansion valve provided the latter was replaced with another type of expansion valve. Mr. Soling then stated that you must have a compressor, condenser, evaporator, electric power and refrigerant. The witness agreed with the definition of the Guide and Data Book of the American Society of Heating, Refrigerating

and Air Conditioning Engineers, as well as with certain dictionary definitions in general terms. Mr. Soling disagreed with the definition of refrigeration in the Encyclopedia Britannica, Vol. 19 (1969), on the basis that a tie-in to a refrigeration cycle or refrigeration compressor was necessary to complete that definition.

On redirect examination, witness Soling testified that farm bulk milk tanks were not domestic refrigerators, storage refrigerators, service refrigerators, reach-in or walk-in refrigerators, refrigerator display cases, cabinets, or rooms. The mounting of the refrigeration components on the ends of the tanks in question is for the convenience of the purchaser and results in savings at the time of installation. Mr. Soling further emphasized that without the components, shown in plaintiff's exhibit 17, a photograph of the refrigeration unit, the farm bulk milk tanks are incapable of performing a refrigeration function. In his opinion, the involved merchandise is a "bulk cooler, not a bulk refrigerator."

Defendant called as its first witness Mr. Raymond Schneider, an assistant professor at New York City Community College, giving courses in refrigeration. In addition to that he also maintains a refrigeration service business. Mr. Schneider taught at the State University of New York at Farmingdale, New York Technical Institute and the Phoenix Technical School giving refrigeration courses. His experience also includes a position as engineering manager for Slant-Fin Corporation which involved air conditioning. Prior to that he was employed by Strautus Division of Fairchild Corporation which involved work on military refrigeration and air conditioning equipment. Mr. Schneider is a member of the American Society of Heating, Refrigerating and Air Conditioning Engineers, and the Refrigeration Service Engineers Society. The witness is a licensed professional engineer in the State of New York. Mr. Schneider testified that refrigeration is basically the removal of heat from an area where it is not wanted and moving it to an area where it is not objectionable. His definition of a refrigerator was an enclosure designed to maintain a space at a lower temperature. The witness agreed with various dictionary definitions as well as those of the Encyclopedia Americana, Vol. 23 (1975), at page 315, and various other handbooks and encyclopedias.

On cross-examination the witness testified that he has sold reach-in and walk-in refrigerators but has never sold household refrigerators nor has he seen merchandise of the kind before the court.

Mr. Schneider agreed that a condenser, receiver and compressor were essential to the operation of a refrigeration cycle and that without it, it could not operate as a refrigerator.

Defendant next called Mr. Joseph Smucker, who is presently employed by the U.S. Food and Drug Administration as senior regional milk specialist. The witness obtained his bachelor of science degree in agriculture from Ohio State University and has been employed by the FDA in Chicago, Illinois and Detroit, Michigan, as well as New York. Prior to that, he was employed as a milk survey officer for the State of Ohio. Before going with the State of Ohio, Mr. Smucker was employed by the Orville Milk Company in Ohio as dairy plant field man for nine years. In all of these positions it was his duty to visit dairy farms for the purpose of inspection for quality purposes. The witness is a member of the International Association of Milk and Food Sanitarians, as well as the Northeast Dairy Council.

The witness, after viewing plaintiff's exhibit 1, testified that he was familiar with bulk milk coolers and the various components of them. According to the witness, the primary function is to cool milk. Its function also has requirements with respect to sanitation, storage and agitation of the milk. The purpose of the agitator is twofold, namely, to agitate the milk during the process of cooling to aid in the cooling, as well as assisting in obtaining a homogeneous sample of the milk. Based upon his observation, bulk milk coolers are not used without refrigeration. The cooling of milk

is a requirement of the pasteurized milk ordinance.

On cross-examination Mr. Smucker testified that he was familiar with the dairy farm inspection report form (plaintiff's exhibit 25) based upon the pasteurized milk ordinance. The form is used during the inspection of a grade A dairy farm and a copy is usually left with the farmer after inspection. The witness marked with a circle the numbers on plaintiff's exhibit 25 relating to bulk milk tanks. Of the 21 numbers contained thereon the witness circled numbers 6, 8, 9–13, 16, 18, 19 and 21. Of these only number 19 relates to cooling. Mr. Smucker testified that in addition to the cooling function, a bulk tank also performs a storage function and protects the contents from external contamination. The agitation of the milk is necessary to properly cool the milk, to obtain a proper sample and to prevent leather-like or cream-like conditions from forming on the surface of the milk when it is retained in the tank. The witness further stated the tanks have a measuring device which is related to how the farmer is paid for his crop.

Based upon the record as made, it has been satisfactorily established that the bulk farm tanks, such as involved herein, are chiefly used on farms and not in commercial establishments. In addition, the parties at the outset of the trial stipulated that raw milk is an agricultural product. While the tanks store the milk and maintain it in a marketable condition until picked up by the dairy, they do not perform a marketing function as did the egg-handling machines in *Staalkat of America, Inc. v. United States,* 56 CCPA 86, C.A.D. 959, 417 F.2d 789 (1969). The use here precedes the marketing aspect of the sale of milk.

There is no dispute between the parties that the tanks in their condition as imported contained neither a compressor, condenser, nor receiver. Likewise, there is no dispute that the tanks could not perform a cooling function without these components. Nevertheless, it is the contention of defendant, in support of its classification, that said tanks are refrigerators or refrigerating equipment or parts thereof. This position is based upon the common meaning of the terms refrigerators and refrigerating equipment.

■ Tariff terms are construed in accordance with their common or commercial meaning, which is presumed to be the same. *Floral Arts Studio, et al. v. United States,* 46 CCPA 21, C.A.D. 690 (1958); *United States v. C. J. Tower & Sons of Buffalo, N. Y.,* 48 CCPA 87, C.A.D. 770 (1961). In the absence of a contrary legislative intent or a commercial designation, tariff terms are construed according to their common meaning. In the case at bar research fails to reveal a contrary legislative intent. Neither party attempted to establish a commercial designation which differs from the common meaning. Therefore, the common meaning controls.

■ Common meaning is a question of law to be decided by the court. Testimony of witnesses is advisory and not binding on the court. *United States v. O. Brager-Larsen,* 36 CCPA 1, C.A.D. 388 (1948); *Tropical Craft Corp. v. United States,* 45 CCPA 59, C.A.D. 673 (1958); *United States v. National Carloading Corp. et al.,* 48 CCPA 70, C.A.D. 767 (1961). In order for the court to determine the common meaning of the term it may consult dictionaries, lexicons and scientific authorities. When the term involved is of a technical nature, the court may rely upon technical sources since dictionaries prepared for general use may not properly reflect the meaning in the trade or industry involved. *E. Dillingham, Inc. v. United States,* 61 CCPA 34, C.A.D. 1114, 490 F.2d 967 (1974). The definition of "refrigerator" contained in the handbook published by the American Society of Heating, Refrigerating and Air Conditioning Engineers (1972), at page 542, was read to witness Soling and is as follows:

Refrigerator—A container and means of cooling it, such as a cabinet refrigerator; or a large container such as a storage refrigerator, service refrigerator, etc.

■ This definition requires a means of cooling the container or cabinet. A review

of the various general dictionary definitions, as well as lexicographic information contained in the record and briefs, establishes that the article must contain a method of cooling by mechanical or chemical means. Accordingly, a refrigerator must have the means to cool. The tanks involved in their condition as imported do not contain such equipment. The mere fact they are designed for use with such equipment does not *per se* make them refrigerators.

The legislative intent of Congress in enacting subpart A is evidenced by the title assigned to said provision which reads: "Boilers, Non-Electric Motors and Engines, and Other General Purpose Machinery." Further legislative intent of the type of article intended to be encompassed by said provision is indicated in the following statement in the Tariff Classification Study, Schedule 6, part 4, subpart A, at page 260:

> This subpart covers a wide variety of machinery and appliances which can be used in numerous industrial applications. As set forth in headnote 1 to this subpart, any machine or appliance which is described in this subpart and also is described elsewhere in this part is classifiable in this subpart. The systematic grouping of general-purpose machines and appliances in this subpart, together with the rule expressed in the headnote, would provide greater stability to the product classifications.

The tanks are not general purpose machines, nor are they used for industrial purposes. This expression of intent is more pertinent than certain conclusory statements contained in the Explanatory Notes to the Brussels Nomenclature (1955), chapter 84.15, relied upon by defendant. This is not to say the Brussels Nomenclature may not be utilized in proper circumstances to ascertain intent when ambiguity exists. The intent as indicated by the title of said subpart is not overcome by the statements in Brussels Nomenclature or the Tariff Classification Study. *Great Western Sugar Co. et al. v. United States,* 59 CCPA 56, C.A.D. 1038, 452 F.2d 1394 (1972). I am, therefore, of the opinion that Congress in

enacting item 661.35, *supra,* did not intend to include the imported tanks as refrigerators. Inasmuch as they are not refrigerators, they cannot be considered refrigerating equipment since the refrigerating equipment is the portion that is missing on importation.

Defendant urges that if the court finds the imported articles are not refrigerators due to their inability to cool the tanks, they are nevertheless subject to classification under item 661.35, *supra,* by virtue of General Interpretative Rule 10(h) which provides as follows:

> (h) unless the context requires otherwise, a tariff description for an article covers such article, whether assembled or not assembled, and whether finished or not finished;

The Court of Customs and Patent Appeals in *Authentic Furniture Products, Inc. v. United States,* 61 CCPA 5, C.A.D. 1109, 486 F.2d 1062 (1973), held certain unassembled bunk beds which had the side rails missing on importation not to be unfinished furniture. The decision was based on the fact that the absence of a substantial or essential part precludes classification as the unfinished article itself.

In the case at bar, the absence of the refrigeration portion is both substantial and essential. Classification as unfinished refrigerators is, therefore, precluded.

It is further urged by defendant that the imported tanks are parts of refrigerators. The bulk farm tanks are imported with a refrigeration control panel containing an expansion valve which controls the flow of the refrigerant into the evaporator as well as certain wires. Witness Soling, however, testified that the thermal expansion valve was not essential to the operation of the refrigeration unit, provided some other type of expansion valve replaced it.

General Interpretative Rule 10(ij) covers parts in the Tariff Schedules of the United States and provides as follows:

> (ij) a provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

■ It is to be noted that parts do not prevail over a specific provision for such part. In the case of *Robert Bosch Corp. et al. v. United States,* 63 Cust.Ct. 187, C.D. 3895, 305 F.Supp. 921 (1969), the court made the following statement in interpreting this language:

> We gather that the words "a specific provision for such part" in the context of Rule 10(ij) are satisfied if a generic term for an article has been listed in the schedules, and must conclude that the language of 685.22 is a sufficiently specific designation for automobile radios and antennas to prevent their classification as parts of automobiles.

By the same token, both provisions of item 666.00 claimed by plaintiff are generic and are sufficiently specific designations to prevent classification as parts of refrigerators.

■ It is well settled in the field of customs jurisprudence that in the absence of deception, disguise, or intent to perpetrate a fraud upon the revenue of the United States, imported merchandise must be classified with reference to its condition as imported. *United States v. Citroen,* 223 U.S. 407, 32 S.Ct. 259, 56 L.Ed. 486 (1912); *United States v. Baker Perkins, Inc., et al.,* 46 CCPA 128, C.A.D. 714 (1959); *Carrington Co. et al. v. United States,* 61 CCPA 77, C.A.D. 1126, 497 F.2d 902 (1974). The record establishes the domestically produced refrigerating unit is attached at the farm at the time the tank is installed in the milkhouse. There is no evidence that the importation without the refrigerating equipment was based upon deception, disguise, or for the purpose of defrauding the revenue of the United States. Therefore, the bulk farm tanks involved in their condition as imported are not refrigerators or refrigerating equipment.

While the above finding precludes a classification under item 661.35, *supra,* defendant's reliance upon certain head notes in TSUS should be considered. Headnote 1, part 4, subpart A of schedule 6 reads as follows:

> 1. A machine or appliance which is described in this subpart and also is described elsewhere in this part, is classifiable in this subpart.

In view of the finding *supra* that the imported tanks are not refrigerators or refrigerating equipment, this headnote is not applicable.

Headnote 2, part 4 of schedule 6 provides as follows:

> 2. Unless the context requires otherwise and subject to headnote 1 to subpart A of this part, a multi-purpose machine is classifiable according to its principal purpose, but if such a machine is not described in a superior tariff heading as to its principal purpose, or if it has no one principal purpose, it is classifiable in subpart H of this part as a machine not specially provided for.

The tanks involved are special purpose machines designed and constructed in accordance with specifications and requirements of 3–A Sanitary Standards formulated by the International Association of Milk, Food and Environmental Sanitarians, the U.S. Public Health Service and the Dairy Industry Committee. As such, the tanks are designed and used for storage of milk in a cooled condition and must be constructed of stainless steel, have an agitator, measuring device, etc. The record establishes to my satisfaction that many of the requirements are coequal with the requirement for cooling. Item 666.00, *supra,* sets forth more specific requirements than does the provision in subpart H for machines not specially provided for and is, therefore, more specific. Item 666.00 is a use provision. The record establishes that the involved tanks are chiefly used on a farm for agricultural purposes. Courts have always given agricultural free lists a broad and liberal construction in order to carry out the legislative intent of Congress to favor agriculture. *C. J. Tower & Sons of Buffalo, Inc., et al. v. United States,* 63 Cust.Ct. 119, C.D. 3884 (1969).

The legislative history as set forth in Senate Report 530 of the Tariff Schedules Technical Amendments Act of 1965, dated

August 2, 1965, indicates an intent to clarify item 666.00, *supra.* The language indicative of this is as follows:

> They also clarify the duty-free status of certain agricultural machinery and implements (and parts) by adding milking machines and onfarm equipment for the handling and drying of agricultural or horticultural products to the duty-free list.

Headnote 2, part 4 of schedule 6 is, therefore, not applicable or binding.

Plaintiff has the twofold burden of establishing not only the incorrectness of the classification but must in addition affirmatively establish the proper classification of such merchandise. The witnesses who were familiar with such merchandise and who were questioned all testified that the bulk tanks are chiefly used on farms. The uncontroverted testimony of witness Guest establishes that the milking system is considered to be handling equipment.

Whether or not the tanks fall within the provision for "handling," they most certainly are within the statutory language "agricultural implements." The claim for free entry under item 666.00, *supra,* is, therefore, sustained.

Judgment will be entered accordingly.