(C.D. 4635)

F. W. MYERS & CO., INC. *v.* UNITED STATES

Court No. 72–3–00710

(Decided February 13, 1976)

*Covington & Burling (Donald Hiss* and *Rodney E. Gould* of counsel) for the plaintiff.

*Rex E. Lee,* Assistant Attorney General (*John N. Politis,* trial attorney), for the defendant.

RICHARDSON, Judge: The merchandise in this case, described on the invoices as Atomet 28 Iron Powder, was classified in liquidation

52

upon entry at the port of Detroit, Michigan, under TSUS item 608.05 at the duty rate of 0.3 cents per pound as other powders other than alloy iron or steel. It is claimed in this action that the merchandise should be classified under TSUS item 608.02 as modified in T.D. 68–9 at the duty rate of 37 cents or 25 cents per ton, depending upon date of entry, as sponge iron powder.

The competing tariff provisions read:

[Classified]

> Other powders:
>> Other than alloy iron or steel

[Claimed]

> Sponge iron; iron or steel powders:
>> Sponge iron, including powders thereof:
>>> Not containing chromium, molybdenum, tungsten, or vanadium in amounts specified in headnote 4 of this subpart

The record in the case is voluminous, covering some 925 pages of trial testimony given by eight witnesses, and includes extensive documentary exhibits and various samples of iron powders, compounds and other forms of iron and iron products, as well as the official papers. The merchandise at bar is covered by some 24 entries which were made by plaintiff as agent for Quebec Metal Powders Limited of Sorel, Canada, the manufacturer.

According to the official papers (placed in evidence by the government) a sample of the imported merchandise, Atomet 28, was subjected to analysis by government chemists at the United States Customs Laboratory in Chicago, Illinois, and reported by the laboratory to be "sponge iron powder containing no dutiable amounts of chromium, vanadium, molybdenum or tungsten." [See customs laboratory report, dated November 25, 1969, in entry No. 106504 of protest 3801–0–000035.] This was prior to liquidation of the subject entries. And the same reports were made by the United States Customs Laboratory in Boston, Massachusetts, following examination of samples of Atomet 28 taken from other shipments entered at the ports of Champlain and Buffalo, New York. [See exhibits 82 through 84.]

Apparently, classification of the instant merchandise proceeded upon the basis of guidelines contained in the headquarters ruling of September 14, 1971, wherein the Customs Service stated (exhibit 86)

> If an imported powder is found to be truly porous throughout under microscopic examination [500X – 700X] of a ground and polished section, it should be classified as sponge iron powder under either item 608.02 or 608.04, TSUS, depending upon metallic content. If, on the other hand, the particles are generally solid at the core, the powder should then be classified either as

other powder in item 608.05, TSUS, or as an alloy powder in item 608.06 or 608.08, TSUS, again depending upon metallic content.

In the event of any remaining doubt as to the proper classification, information as to the process by which the imported powder was made should be obtained. If the powder was produced by the solid state reduction of iron oxide below the melting point of iron, then the resulting product is sponge iron. If the imported powder was produced by atomization, or some other similar process involving heating the raw material to a molten state, the resulting product should be classified under one of the provisions for other powders.

But in the Summaries of Trade and Tariff Information (1967) the Tariff. Commission, reporting on commodities under TSUS items 608.02 and 608.04, stated [exhibit 85, p. 57]:

Sponge iron is a porous spongelike material generally in the form of a cake and usually containing 96 percent or more of iron, the remainder being largely of carbon. In the United States sponge iron is produced principally by reducing uniform high-grade iron ore with coke at temperatures well below the melting point of iron. Sponge-iron powder, a virtually pure, finely divided, iron containing as much as 98.5 to more than 99 percent by weight of iron, is produced by pulverization of the sponge-iron cake. The pulverized iron is annealed in a hydrogen atmosphere to eliminate the effects of the cold working (pulverizing) and also to further reduce the content of carbon and oxygen.

Sponge iron is also produced by the atomization of molten cast iron or steel scrap of carefully selected analysis. The atomization introduces oxygen into the material; however, the oxygen, as well as the carbon contained in the scrap, can be minimized by heat treatment. The heat treatment results in a cake of sponge iron which is converted to sponge-iron powder by milling.

And the findings of the Tariff Commission, relative to the existence of more than one process for the manufacture of sponge iron, find support in the published writings of Dr. W. D. Jones,[1] a noted English power metallurgist whom expert witnesses for both parties herein acknowledge as a leading authority in the field of powder metallurgy. [See exhibit 10, p. 47, wherein Dr. Jones calls attention to a number of "modern sponge iron processes".]

The method of manufacture of the imported merchandise, Atomet 28, is described in the testimony of Dr. Harry Durney, Jr., vice president of Quebec Iron and Titanium Corporation (the parent company of the exporter Quebec Metal Powders) in charge of planning and technology, with similar responsibilities for Quebec Metal Powders. According to Dr. Durney the process starts with molten

---

[1] Fundamental Principles of Powder Metallurgy (1960), pp. 47–50,

iron containing 4 percent carbon which comes from the Quebec Iron and Titanium smelter. The initial step involves the granulation of the molten iron with water and air in order to disintegrate the particles. The disintegration causes the molten iron to be converted into coarse granules and the medium of air causes oxidation of the iron. The air is drawn through the atomization zone in order to oxidize the material.

The coarse granules are then dried, and then the granules are reduced in size by ball milling.

The ball-milled material is then passed through a reduction furnace. The furnace operates in a temperature range of 1,850 to 1,950 degrees Fahrenheit, which is below the melting point of iron. The atmosphere in the furnace is nitrogen and hydrogen which is created by the disassociation of ammonia. In the furnace, carbon and oxygen unite to form carbon monoxide and excess oxygen in the material reacts with the hydrogen present to form water vapor.

The discharge from the reduction furnace is a sponge iron cake. And this cake, a sample of which is in evidence as exhibit 5, is then put through an attrition mill which breaks it down to powder size. The powder is then screened, any oversizes are removed, and is finally blended to obtain uniform powder, culminating in the product Atomet 28, a sample of which is in evidence as exhibit 6.

Dr. Durney further testified that when Atomet 28 was first imported into the United States in early 1969 it was classified by the Customs Service under TSUS item 608.02, which is the provision for sponge iron, and that the classification for this merchandise was subsequently changed.

Dr. Joel S. Hirschhorn, professor of metallurgical engineering at the University of Wisconsin and consultant to the powder metallurgy industry testified that he made an extensive visit in the manufacturing plant where Atomet 28 is made, and is familiar with its manufacture. Professor Hirschhorn corroborated the testimony of Dr. Durney to the effect that the product which comes out of the reduction furnace is a sponge iron cake which is mechanically broken up to produce the final sponge iron powder. Much of the testimonial and other evidence given by this and other witnesses who followed him goes into considerations of particle characteristics, testing procedures and apparatus and procedures for examining individual iron particles and groups of particles under high magnification with a view toward ascertaining whether or not the particles are sponge iron particles. Professor Hirschhorn stated that there is substantial porosity in Atomet 28, that this porosity is caused by the presence of iron oxide, and that in his opinion Atomet 28 is a sponge iron powder. And the witness also pointed out, among other things, that the breaking up of the sponge iron cake affects the distribution of the porosity.

Dr. Leander Pease, cofounder-owner of Powder-Tech Associates, Inc. of Burlington, Massachusetts, which engages in research, development, and engineering in all areas of powder metallurgy, testified that his company does consultation work for producers of metal powders and metal parts fabricators, among others, and that he gained familiarity with Atomet 28 from having examined samples of it in connection with industry consultations, and also gained familiarity with the manufacturing process as a result of having visited the plant in Sorel on several occasions. Dr. Pease stated, among other things, that the ball-milled feed material is put into a reduction furnace and that the product coming out of the furnace at the discharge end is "a sponge iron cake" which is later milled to achieve the final Atomet 28 product.

With respect to exhibit 72 (A & B) which represents scanning electron microscope micographs of QMP Atomet sponge iron cake, Dr. Pease testified (R. 392–93):

> Q. I show you Plaintiff's Exhibit number 72 and ask you to explain what it shows.
> A. Exhibit 72 "A" and "B" are of the Q.M.P. Atomet sponge iron cake, which is the product that issues from the discharge end of the reduction furnace. In this case a piece of the cake was fractured, and then its fractured surface examined at 1350X and 2400X.
> The most important feature to notice in this is that the particles that are present at this discharge end of the furnace indeed are porous.
> Here's an example in the lower picture. In the upper left hand corner this particle clearly shows dark round porosity; so does this one down here on the lower left hand side. You can also see at this stage that there are, indeed, particles which are not porous, and I think that this elongated particle on the upper right hand side here doesn't show any evident surface porosity, although there are some other pieces laying here.
> Q. Is there any theme that runs through both of those photographs?
> A. Yes. We have to say that we're looking at a porous material here. There's no question about it.

And with respect to the nature of a pore of an individual powder particle of Atomet 28 examined at great length, Dr. Pease testified (R. 401–03):

> Q. Dr. Pease, with specific reference to Exhibit 74, could you explain what that exhibit shows?
> A. I could. What we have done in this case is taken a mount of the Atomet-28 powder, prepared in the way that I described before, but what we wanted to do was to see how the shape of an individual pore might change in a given particle as you went down through successive layers in that particle because generally when one examines a material by optical micrograph one is look-

ing at one plane. What we will show here is that if you look at different planes with the same particle you see somewhat different things. So that you have to be a little careful in conclusions that you draw from this one picture. We found one particular pore which had a characteristic shape to it and that characteristic shape was this triangular pore. We didn't hunt around for a particularly spongy particle or substantially solid one but really only a pore that could be readily identified. And this we did because we have to go and polish this thing for a certain length of time and then go back and find the same particle amongst several millions of others. It takes a careful procedure to be sure you can find the same particle. We were able to do that successfully. So, the picture then from the left to right in here show what the results were on that one particular particle after polishing. The numbers below it represent the cumulative material we removed in inches. They are very small numbers. But the sum total from this end down to here is about a half a thousand or five ten-thousandths of an inch material removed. You can see that first of all this pore is not just some artifact right at the surface but that it runs in a very definite finite depth in toward here ending up rotated about 90 degrees and down, as it appears over here. Another interesting thing, you can take something relatively solid at this end or view and polish off half a thousandth of an inch and you have got something that looks like a very porous kind of particle. So it helps point out very graphically the problems in what you can learn in the polishing. . . .

Dr. Pease stated that he considers Atomet 28 to be porous, and that it is a sponge iron powder. He also pointed out that in the QMP process the iron oxide is deliberately introduced during the "granulation step", and that there are several different methods of manufacturing sponge iron powder, depending upon the starting feed material which is used.

Other witnesses who testified in the case do not appear to have seen the manufacturing process underlying Atomet 28, but appear to have examined the powder itself in various ways. Dr. Eric John Chatfield, senior research scientist at the Ontario Research Foundation near Toronto, Canada, and head of the electron optical laboratory, testified that he examined samples of Atomet 28, among other iron powders, under a scanning electron microscope, an electronic device which he described in some detail. He concluded from his examination of Atomet 28 that its small particles are more porous than its large particles, and that porosity in the particles examined extends from the surface down into the interior of the particles.

So much for testimony elicited from witnesses called on plaintiff's behalf.

Defendant called four witnesses on its behalf. George Abbott, vice president and general manager of A. O. Smith-Inland Powder Metallurgical Division who supervises the production, planning and direct

research of the metal powder operation, testified that he examined samples of Atomet 28 and is familiar with the process by which it is made. [The record does not indicate how he acquired his familiarity with the Atomet 28 process.] He stated that he does not consider Atomet 28 to be a sponge iron powder although it has porosity because its manufacture involves a liquid stage which indicates its classification to be an "atomized" powder.

Athan Stosuy, manager of new product development at Hoeganaes Corporation testified that his duties include keeping track of competition, evaluating materials and determining his company's competitive position among its competitors, that Hoeganaes competes with Quebec Metal Powders in the sale of iron powders in the United States, and that such competition extends to the product Atomet 28. The witness testified that Hoeganaes filed an American manufacturer's protest with the Customs Service asking that Atomet 28 be classified not as a sponge iron powder but as other iron powders, and that this protest culminated in a new ruling by the Customs Service which is reflected in exhibit 86, *ante*.

Mr. Stosuy testified that he received samples of Atomet 28 in various stages of production, conferred and collaborated with Dr. Henry Hausner in having tests and examinations made on these samples with a view toward characterizing the powder and ascertaining the oxygen content and oxide distribution at different stages of production. According to the witness the oxygen content after atomization was found to be 6.1 percent which represents 24.4 percent iron oxide by weight. The carbon content was found to be relatively high at 2.74 percent which made the powder very brittle. The ball-milled material had generally finer sized particles, and the oxygen content was found to be 5.18 percent which represents about 21 percent iron oxide by weight. In looking at exhibit S, a photomicrograph of Atomet 28 annealed cake taken at a magnification of 200X, Mr. Stosuy stated that the view shown represented a true cross section since the material is sintered together and had no chance to separate. The porous particles were mainly confined to the finer sizes, and the spongy particles outnumbered the solid particles but the solid particles outweighed the spongy particles. The ratio of porous particles to solid particles was said by the witness to be in the order of 17/93 which he could not consider to be a sponge iron powder, viewing the powder as a whole.

When asked by the court what the value of porosity was, Mr. Stosuy said that it was the particles' ability to hold together when they are pressed—referred to as "green strength". The witness was of the opinion that in order for a powder to be called a sponge iron powder it would have to be porous in essentially every particle. And he said that he considered Atomet 28 to be an atomized powder.

Dr. Henry H. Hausner, a consulting engineer in powder metallurgy, editor of powder metallury books and journals, and a teacher in powder metallurgy, testified that the characteristic of sponge iron powder is interconnected porosity extending from the center of the particle to its surface in the manner of an ordinary sponge. He stated that when he received samples of Atomet 28 to which Mr. Stosuy referred he decided to separate the fine particles from the course particles. His experience had been that the fine particles have different characteristics than the coarse particles. He also ordered an apparent density measurement on samples, followed by microscopic investigation. He said that in looking at hundreds of views of Atomet 28 he saw four different types of particles, i.e., particles which did not contain any porosity, particles which contained only surface porosity, particles with partial porosity, and particles which were perfectly spongy.

Dr. Hausner estimated on the basis of his examination of Atomet 28 samples that the powder consisted of approximately 20 percent sponge iron particles, in consequence of which, he did not consider Atomet 28 to be a sponge iron powder, but believes it to be a "mixed powder", containing a minority of spongy particles by weight. And Dr. Hausner agreed with the statement from an article authored by Messrs. Leadbeater, Northcott and Hargreaves on page 90 of the book Iron Powder Metallurgy Book which he edited, and which reads "The specific surface of iron powders is not independent of the porosity of the bed, owing to the presence of a double system of porosity; there is one system around the powder particles and the other inside them."

Harry Ambs, a powder metallurgist employed as manager of technical service for the metals group of Glidden Metals, testified that he was also of the opinion that Atomet 28 was a mixed metal powder, and not an atomized powder as he had originally thought it to be based upon his examination of a sample when it first came out on the market and the manufacturer's literature available at that time. From the evidence given at the trial in this case the witness said that he was of the opinion that Atomet 28 possessed some particles of low density, high porosity, and some particles of high density and low porosity as the end product of a manufacturing process similar to the Mannesmann process which he says Jones regards as producing a mixed metal powder. And he does not consider Atomet 28 to be a sponge iron powder because the solid, dense particles predominate by weight in this powder.

Mr. Ambs did admit, however, that every particle of an iron powder need not be porous in order for the powder to be designated a sponge iron powder. And he pointed to a number of solid particles in photo-

micrographs and SEMs of an Ancor MH100 powder which was acknowledged to be a sponge iron powder. He also stated that the tests he would perform on Atomet 28 in order to determine if it is a sponge iron powder would include tests of its compressibility and green strength. He had previously pointed out that one of the weaknesses of an atomized powder was its low green strength.

Plaintiff argues that a limited amount of iron oxide can result in a powder that is very spongy and definitely a sponge iron powder, that the feed material need not be 100 percent iron oxide in order to produce a sponge iron powder, and that Atomet 28, when judged as a whole as it should be judged, is a sponge iron powder and not a mixed powder (brief, p. 62).

Defendant argues (brief, pp. 44, 47):

> The Government does not dispute the fact that there are sponge iron particles in Atomet 28. There is a controlled amount of iron oxide which is formed during the atomization process which subsequently becomes sponge iron after completing the annealing reduction process.
>
> Since an amount of sponge iron does exist, we then must look to see what amount of sponge iron is produced in Atomet 28. . . .
>
> \*    \*    \*    \*    \*    \*    \*
>
> It is manifest from the uncontradicted chemical analysis which Mr. Stosuy conducted on Atomet 28, in its various stages of production, that the sponge iron content of Atomet 28 is in the minority by weight when compared to the solid atomized particles. The only source of sponge iron in Atomet 28 is the iron oxide which is created during the atomization process. The iron oxide content is controlled and geared to the carbon content of the molten material which is to be atomized. Since the sponge iron content of Atomet 28 is relatively small, the presence of such a small quantity, by weight, of sponge iron should not be controlling in determining its classification.

Defendant goes on to conclude that Atomet 28 is not a sponge iron powder although the small sponge iron particles are distributed throughout the powder because porosity *does not occur throughout all the particles.*

The evidence in the record shows that the feed material for the manufacture of Atomet 28, the imported merchandise, is artifically produced by a process which includes an atomization step. However, after the creation of this iron oxide material and ball milling of it, the record shows that the material is subjected to solid state reduction and annealing steps to produce the cake, the basic product from which the imported merchandise is derived by pulverization.

The government chemists at two separate regional laboratories have analyzed the imported merchandise and other importations of

it on separate occasions and have concluded that it is sponge iron powder, and this, both before and after guidelines were handed down by the Customs Service regarding the classification of such merchandise. Moreover, the Tariff Commission, whose many functions include the monitoring of the origins of imported merchandise and their uses in commerce and industry, reports that products manufactured in the two-stage method described for the production of the instant merchandise, i.e., liquid state production of iron oxides followed by solid state reduction of the oxides, are recognized in the industry as sponge iron powder—a posture which is supported by the testimony of at least half of the powder metallurgists giving testimony in this case. And the government concedes in this case that some sponge iron exists in the imported merchandise.

What the case comes down to then is how significant is the government's "mixed powder" concept and balancing of particles as a predicate for sustaining classification of the subject merchandise in the face of such cogent evidence that the instant merchandise is sponge iron powder.

Defendant states (brief, p. 57):

> . . . The mixed powder theory is not new since Dr. Jones in his *Fundamental Principles of Powder Metallurgy* (introduced by plaintiff) considered Mannesmann RZ process to produce a mixed iron powder. This Mannesmann process is similar to the process used for the production of Atomet 28. . . .

Undoubtedly, this argument reflects the testimony of defendant's witness Ambs previously noted herein who, like the other powder metallurgists who testified in the case, considers Dr. Jones to be a well respected authority in the field of powder metallurgy.

In the court's view both counsel for the government and Mr. Ambs have misread Dr. Jones' statements in this instance. The words "mixed powder" were not employed by Dr. Jones, but by Mr. Ambs. Dr. Jones used the phrase "a mixture of particles with high density and low microporosity with particles of low density and high microporosity" in discussing the characteristics of the powder product of the Ferrum process. [Exhibit 10, p. 48.] And the words "mixed particles" do not bear the same meaning in this context as the words "mixed powder" because Dr. Jones is discussing only sponge iron powders under the heading REDUCTION OF OXIDES [exhibit 10, p. 8], and is comparing the advantages and disadvantages of the various sponge iron powders produced by different methods. Thus, according to Dr. Jones, the Mannesmann process [Naeser] is deemed to be a more expensive process than a *typical sponge iron process* because of its three-stage tier, i.e., preparation of melt, atomization, and

reduction, but that at the same time the Mannesmann process is capable of much larger expansion in the future than the Hoeganaes process, among others. because of its independence of magnitude of supply of selected concentrates, among other things. [Exhibit 10, p. 50.]

Therefore, contrary to the assertions made by government counsel and the witness Ambs, it is clear that the concept of mixed particles in an iron powder is compatible with the designation of that powder as sponge iron as is manifest in the documented research of a renowned and respected powder metallurgist. And no attempt is made to differentiate between the mixed particles in terms of respective weights for any purpose. Moreover, in its "mixed powder" argument, defendant's rejection of the solid, irregular particles is based upon a consideration of only intra-particle porosity. But inasmuch as the value of porosity is said to relate to the green strength rating of a compressed powder it is clear that the efficacy of inter-particle porosity, a pertinent factor recognized by the government's witness Hausner, must necessarily be taken into consideration even with respect to these seemingly solid and irregular shaped particles in the evaluation of the powder mass.

Certainly, the credible evidence in this case indicates that no iron powder reputed to be sponge iron powder contains intra-particle porosity in every particle. And from the court's own examination of the micrographs [2] of both the cake and powder forms of Atomet 28 the court is of the opinion that substantial intra-particle porosity exists in this product such that it can be said to be a porous iron powder. Consequently, the court finds no merit in the government's "mixed powder" theory, and it should not influence the classification of the instant merchandise.

Furthermore, it should be noted that the guidelines handed down by the Customs Service (exhibit 86) do not *ipso facto* mandate classification of iron powders by the administrative officials at the ports of entry, but leave the determination of classification to those officials charged with the responsibility for scrutinizing and analyzing the powders. Under the circumstances of this case the court is of the view that the district director should have followed the recommendations of the Customs chemists at Chicago who reported the subject merchandise to be sponge iron powder.

For the reasons stated, the claim of the plaintiff is sustained. Judgment will be entered accordingly.

---

[2] (That includes slides of stereo pairs projected onto a movie screen in the courtroom during the trial which very convincingly disclose in three dimensions the in-depth porosity of Atomet 28 powder particles)