**SORTEX COMPANY OF NORTH AMERICA, INC.**

v.

**UNITED STATES.**

**C.D. 4746; Court No. 74–11–03110.**

United States Customs Court.

June 6, 1978.

Schwartz & Lidstrom, Chicago, Ill. (Steven P. Sonnenberg, Chicago, Ill., and Donald J. Ungar, San Francisco, Cal., of counsel) for plaintiff.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C. (Sheila N. Ziff, New York City, trial atty.), for defendant.

RICHARDSON, Judge:

Electronic optical color sorting machines exported from England in December, 1973, were classified in liquidation upon entry at Detroit, Michigan, under TSUS item 712.49 as modified by T.D. 68–9 as other electrical measuring, checking, analyzing or automatically-controlling instruments and apparatus at the duty rate of 10 *per centum ad valorem*. And the plaintiff-importer claims that the machines should be classified under TSUS item 666.25 as modified by T.D. 68–9 as other industrial machinery for preparing

and manufacturing food at the rate of 5.5 *per centum ad valorem.* Two models are involved in the importations before the court, namely, models 964 and 964C.[1]

At the trial Daniel Garnett, principal engineer of A. M. F. Incorporated, electrical products development group, testified that, among other things, he was employed as an engineer by plaintiff for approximately 10 years between 1966 and October, 1976, and that his duties included machinery development, application and installation engineering, and, to some extent, involved the marketing of machines of the type in issue. Mr. Garnett was with Sortex when these machines were first introduced to the United States market, was involved in the initial introduction of the machines in that market, and worked as an engineer on many of the design problems which arose when the basic machines were adapted to different products. According to the witness the machine, as originally introduced, was designed for the sorting of rice, but was later adapted to sort beans, peanuts and corn, and to a small extent minerals and plastics.

Mr. Garnett testified that the machine operates by feeding the product to be sorted so that it is metered and singulated in the feed-in system. The product passes single file through optical chambers where electronic photosensors compare the product to a pre-set background. If a particle combined with the desirable product causes variations of reflectivity, because it is of a different color, an air blast is triggered electronically and that particle is removed from the stream of acceptable product. Individual particles are sorted, graded and screened in the sorting machines.

Based upon his experience and expertise as an installation engineer Mr. Garnett described essential considerations in determining where the machines can be used efficiently. The machine must be placed in a suitable environmental area, away from temperature extremes, in a dry atmosphere, with access to main power and compressed air, out of direct sunlight and with suitable facilities for transport of the product to be sorted to and from the machine. Rain or snow could cause severe problems with the electronics and the electrical functions of the machine. Direct sunlight would upset the balance of light in the machine and adversely affect the performance of the machine. The witness said his role in marketing the sorters consisted of assisting Sortex salesmen in defining the best place in the various process lines to fit the machine, defining installation costs and ancillary equipment requirements.

Other evidence in the record discloses usage of the imported machines in the sorting of specific food products, namely, white beans, peanuts, almonds, pecan pieces, sesame seed, dehydrated potato pieces, split soybeans, peppers, cereal components, etc., in 23 states. Two of these sorting operations involving the machines were viewed by the court and counsel at the conclusion of the trial at plant sites in Michigan, namely, a peanut sorting operation at Livonia, Michigan, and a navy bean sorting operation at Charlotte, Michigan. In both instances the court observed, among other things, that the food products were fed from the blancher into the Sortex machines and emerged therefrom after the removal of undesirable peanut and bean particles which were rejected and collected separately. Following the sorting of the peanuts the splits were further processed into peanut butter and placed in glass containers in the same plant.

Plaintiff contends primarily that the imported machines are described in item 666.-25, and argues "[t]he Sortex machines of the same class or kind as those at issue herein, are chiefly used midway in the processes which take place in preparing and manufacturing food." Defendant counters, "it is patent that the Sortex 962 and 964 sorting machines were not, as of January 1974, chiefly used for preparing and manufacturing food, but, rather, to prepare various foodstuffs for market."

---

1. Additionally it was stipulated at the trial that the model 962 machine concerning which testimony would be offered is the same as the model 964 machine which superseded it in production.

In the court's opinion the imported machines do come within the ambit of item 666.25.

The word "prepared," in the tariff sense as related to food has been judicially construed to mean that the food has been so processed as to be changed in character or advanced in condition and made more valuable for its intended use. *Stone & Downer Co. v. United States*, 17 CCPA 34, at p. 36, T.D. 43323 (1929).

In some of the cases before the court food, such as beans, is put in packages for sales to the wholesale-retail trade immediately after sorting, and in some others the food is subjected to additional processes in the same or another building before being packaged or sold as food, such as corn, candy, salted nuts, peanut butter, etc. Plaintiff contends that these processes either change the character of the mentioned food items or advance them toward the condition in which they are used. Plaintiff cites as supporting authority for its position that the sorting and grading function of the Sortex machines is a part of the process of preparing and manufacturing food the case of *Antonio Roig Suers. S. En C. v. United States*, 420 F.2d 750, 56 CCPA 72, C.A.D. 957 (1969), where the function of a 10-ton electric tower crane was to pick up sugarcane from a stockpile and load it on a conveyor, and thus start the sugarcane on its way into a sugar mill factory was held to be the first step in the process of manufacturing sugar from cane. Preparing beans or peanuts for human consumption requires a number of operations and many pieces of equipment of various kinds and the Sortex machine is one of them.

■ Plaintiff also relies on the 1969 *Summaries of Trade and Tariff Information* which include on its list of "other" industrial machines for preparing and manufacturing food, machines "to . . . sort, grade, . . . [and] screen," which is precisely what the Sortex machine before the court does. Since the 1969 *Summaries of Trade and Tariff Information* were prepared *after* the Tariff Schedules of 1963 were enacted they are "not necessarily con-trolling in determining the intent of the enactors of the statute." *Dodge & Olcott, Inc. v. United States*, 45 CCPA 113, at p. 116, C.A.D. 683 (1958). Though the 1969 *Summaries* are "not necessarily controlling," their broadening of the 1948 list of the more important "other" kinds of machines under item 666.25 that perform functions in the preparation and manufacture of food that are similar to those listed in the *Summaries of Tariff Information* in 1948, is in keeping with the responsibility of the United States Tariff Commission to update the commodity *Summaries of Tariff Information*, and shows a recognition of "other" industrial machines that are just as essential to the preparation and manufacture of food as the machines previously listed. While machines that *sort, grade* and *screen* may have been considered embraced in "other" food preparing machines in the *Summaries of Tariff Information* of 1948, expressly listing such machines in the *Summaries of Trade and Tariff Information* of 1969 leaves no doubt that the Tariff Commission classifies a machine that performs the functions of *sorting, grading* and *screening*, as does the Sortex machine, as an industrial machine for preparing and manufacturing food. The *Summaries of Trade and Tariff Information* do serve as a helpful guide to the courts as well as the legislature in reaching decisions.

■ Where there is a substantial similarity between the function of two items of merchandise—one recognized and listed in a category in the *Summaries of Tariff Information* (1948), before the enactment of a statute (1963), and one listed under the same category in subsequent *Summaries of Trade and Tariff Information* (1969), after the enactment of said statute, the court may appropriately consider the two items of merchandise as being classified under the same item in the tariff schedules. See: *Christensen Diamond Products Co. v. United States*, 54 Cust.Ct. 221, C.D. 2537 (1965), where natural diamond dust was known before 1930 and was provided for in the Tariff Act of 1930, and synthetic diamond dust was developed after 1930, but both

items of merchandise were substantially similar and performed substantially similar functions, and the court held that synthetic diamond dust should be classified the same as natural diamond dust.[2] See also *F. W. Myers & Co., Inc. v. United States*, 76 Cust.Ct. 51, C.D. 4635 (1976).

The defendant contends that the decision in *Sortex Co. of North America v. United States*, 410 F.2d 443, 56 CCPA 41, C.A.D. 951 (1969) is controlling in this case. The issue in the previous *Sortex* case was whether the machine was an agricultural instrument used in connection with farming operations or was a machine having as an essential feature an electrical device. The evidence clearly established that the machine was not employed by farmers on the farms but by business enterprises away from the farms which process crops produced by the farmers, and that the machine had as an essential feature an electrical element or device. The decision did not go so far as to say that when the Sortex machine is used as the end part of a preparation and manufacturing process (as in the case of beans) or as the middle part of such a process (as in the case of peanuts—some cleaned, shelled, separated and salted before sorting; some roasted, blanched and salted before sorting; and some sorted with the splits being made into peanut butter), the machine should not be classified under a more appropriate item in the Tariff Schedules. The issue in this case was not before the court in the earlier *Sortex* case.

After touring a Velvet Food Products, Inc. peanut butter plant in Livonia, Michigan, and a white bean processing plant in Charlotte, Michigan, with counsel for the parties in this case; seeing how the Sortex machine functions as a machine in the processing of said food items, and reviewing the record, especially pages 84 through 134 covering the use of Sortex machines in processing sesame seed, almonds, pecans, peanuts, white beans, soybeans, dehydrated potato pieces, peppers, cereal components, etc. In thirty one locations in the United States, the court is of the opinion that the chief use of the Sortex machine is as an industrial machine for preparing and manufacturing food by sorting, grading and screening food items for human consumption, and the court so holds.

■ The Sortex machine like so much other food processing machinery has as an essential element an electrical device, but it is more specifically provided for under TSUS item 666.25 as other industrial machinery for the preparation, processing and manufacture of food than under item 712.49 as other electrical measuring, checking, analyzing or automatically-controlling instruments and apparatus for ships' logs, and for measuring and detecting alpha, beta, gamma, X-ray, cosmic or similar radiations, seismographs, etc., and the court so holds. See: Interpretive Rule: "10(c) an imported article which is described in two or more provisions of the schedules is classifiable in the provision which most specifically describes it . . .." Judgment will be entered for the plaintiff.

**2.** Congress amended the Tariff Act to conform the statute with the *Myers* decision. See: Senate Finance Committee Report, No. 530, on H.R. 7969, 89th Congress, 1st Session, at p. 13, on the Tariff Schedules Technical Amendments Act of 1965. The Report states:

". . . the Customs Court ruled in two separate cases that synthetic diamond dust was included within the duty-free designation under the old tariff law. (*Christiansen [sic] Diamond Products Co. v. U.S.* C.D.2537; *Englehard Hanovia, Inc. v. U.S.* C.D.2538.) In each instance, the Court found that the term 'diamond dust' was not qualified by anything which preceded it in the statutory language; that the statute involved was an unqualified *eo nomine* provision; and that synthetic diamond dust, like its natural counterpart, was duty-free for tariff purposes.

"Notwithstanding the fact that these Customs Court decisions are not yet final, your committee desires to make it clear that in the future synthetic miners' diamonds and synthetic diamond dust and powder are to be free of duty in the same manner as their natural counterparts.

"Accordingly, a new section is added to the bill to provide duty-free treatment for synthetic diamond dust and miners' diamonds. . . .."